# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ORGANOGENESIS INC., | : | | |
| Plaintiff, | : | Civil Action No.: | 13-cv-2033 (RC) |
| v. | : | Re Document No.: | 3, 12 |
| KATHLEEN SEBELIUS, | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AS MOOT

## I. INTRODUCTION

Plaintiff, Organogenesis, has filed suit against Defendant Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services ("HHS"), challenging under the Administrative Procedures Act ("APA") the Centers for Medicare & Medicaid Services's ("CMS") 2014 final rule packaging the drug Apligraf into payment for the service in which it is applied. Presently before the Court is Plaintiff's motion for preliminary injunction and Defendant's motion to dismiss. Upon consideration of the pleadings and the relevant legal authorities, the Court finds that it lacks jurisdiction to resolve the merits of the Plaintiff's claims. Accordingly, the Court grants Defendant's motion to dismiss and denies Plaintiff's motion for a preliminary injunction as moot. The Court shall not address Plaintiff's motion for a preliminary injunction in its Memorandum Opinion, but only the Defendant's motion to dismiss.

## II. FACTUAL BACKGROUND

Title XVIII of the Social Security Act of 1935, 42 U.S.C. §1395 *et seq.*, establishes the Medicare program, which provides federally funded medical insurance to the elderly and disabled. Part A of the Medicare program provides insurance coverage for inpatient hospital care, home health care, and hospice services. *Id.* §1395c. Part B of Medicare is a voluntary program that provides supplemental coverage for other types of care, including outpatient hospital care. *Id.* §§ 1395j, 1395k.  Under this program, physicians, hospitals, and other health care providers may obtain payment from Medicare when they provide covered services to persons enrolled in Medicare Part B. The Medicare program is subject to both fiscal limits and restrictions on administrative and judicial review.

A component of the Medicare Part B program is the Outpatient Prospective Payment System ("OPPS"), which pays hospitals directly to provide outpatient services to beneficiaries. Under OPPS, hospitals are paid prospectively for their services in each upcoming year, thus requiring payments for outpatient hospital care to be made based on predetermined rates. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997). Under OPPS, payment is based on the Ambulatory Payment Classification ("APC") to which an item or service is assigned. Pursuant to 42 U.S.C. §1395*l*(t), payments are calculated through a formula, setting payment weights for the provision of certain services, or groups of clinically similar services, as determined by the agency. *Id.* at §§1395*l*(t)(2)(C). These APC calculations are based on the mean or median cost of providing such services in past years, with adjustments for regional cost variations. *Id.* at §§1395*l*(t)(2)(C) – (D). Hospitals facing actual costs significantly above their prospective payment amounts receive outlier adjustments from the Secretary of the Department of Health and Human Services. *Id.* §1395*l*(t)(2)(E).  Hospitals can also receive supplemental

payments, called "pass-through" payments, to help cover the cost of providing certain treatments, including new drugs, biologicals, and medical devices. *Id.* §1395*l*(t)(6).

The Balanced Budget Refinement Act of 1999 required CMS to annually update payment weights, relative payment rates, wage adjustments, outlier payments, and APC groups. It also required CMS to establish payments in a "budget-neutral" manner — that is, CMS must maintain a balanced budget and cannot provide payments exceeding a set budget. *Id.* §1395*l*(t)(2)(E). Thus, whenever the Secretary makes any type of payment adjustment, the additional projected expenses must be offset by a reduction in all prospective payment rates. *Id.*

Apart from reimbursement authority for general outpatient services, CMS must separately pay for a category of drugs and biologicals known as "specified covered outpatient drugs" ("SCODs"). The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") Pub. L. No. 108-173, §621(a), 117 Stat. 2066, 2307 (2003). Congress has specified the methodology for determining the payment rates of SCODs in a separate provision. *See* 42 U.S.C. §1395*l*(t)(14). This provision defines a SCOD as follows:

> In this paragraph, the term "specified covered outpatient drug" means, subject to clause (ii), a covered outpatient drug (as defined in section 1396r-8(k)(2) of this title) for which a separate ambulatory classification group (APC) has been established and that is--
>
> (I)    a radiopharmaceutical; or
>
> (II)   a drug or biological for which payment was made under paragraph (6) (relating to pass-through payments) on or before December 31, 2002.

Covered outpatient drug is defined in 42 U.S.C. §1396r-8(k)(2) as follows:

> Subject to the exceptions in paragraph (3), the term "covered outpatient drug" means –
>
> (A) of those drugs which are treated as prescribed drugs for purposes of section 1396d(a)(12) of this title, a drug which may be dispensed only upon prescription (except as provided in paragraph (5)), and—

(i) which is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 355 or 357] or which is approved under section 505(j) of such Act [21 U.S.C.A. § 355(j) ];

(ii) (I) which was commercially used or sold in the United States before October 10, 1962, or which is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug; and (II) which has not been the subject of a final determination by the Secretary that it is a "new drug" (within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 321(p)]) or an action brought by the Secretary under section 301, 302(a), or 304(a) of such Act [21 U.S.C.A. § 331, 332(a), or 334(a) ] to enforce section 502(f) or 505(a) of such Act [21 U.S.C.A. § 352(f) or 355(a) ]; or

(iii) (I) which is described in section 107(c)(3) of the Drug Amendments of 1962 and for which the Secretary has determined there is a compelling justification for its medical need, or is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug, and (II) for which the Secretary has not issued a notice of an opportunity for a hearing under section 505(e) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 355(e) ] on a proposed order of the Secretary to withdraw approval of an application for such drug under such section because the Secretary has determined that the drug is less than effective for some or all conditions of use prescribed, recommended, or suggested in its labeling; and

(B) a biological product, other than a vaccine which—

(i) may only be dispensed upon prescription,

(ii) is licensed under section 262 of this title, and

(iii) is produced at an establishment licensed under such section to produce such product; and

(C) insulin certified under section 506 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 356].

In 2004 and 2005, CMS was required to provide separate reimbursement for SCODs, as determined by Congress's payment methodology laid forth in the MMA. 42 U.S.C. §1395*l*(t)(14)(A)(i)-(ii). During these years, CMS also provided separate reimbursement for other high-cost drugs and biologicals that were not SCODs, but based payment on a different

4

methodology — the median cost methodology that CMS also applied to non-drug items and services. 69 Fed. Red. 65,682, 65,800 (Nov. 15, 2004). Starting in 2006, however, CMS began to use the SCOD methodology to calculate payments for non-SCOD, high-cost drugs and biologicals. CMS recognized that it was required by statute to pay for SCODs based on the specific payment methodology established in the MMA, but decided to extend that methodology to non-SCOD drugs and biologicals as a policy choice. 77 Fed. Reg. 68,210, 68,383 (Nov. 15, 2012).

Apligraf is a bioengineered product manufactured from living skin cells. It is made from living healthy cells that stimulate a wound to heal. It is used in the treatment of chronic, hard-to-heal venous leg ulcers and diabetic foot ulcers. In 1998, the FDA approved Apligraf for marketing under its premarket approval ("PMA") process for "use with standard therapeutic compression for the treatment of non-infected partial and full-thickness skin ulcers due to venous insufficiency of greater than adequately responded to conventional ulcer therapy." FDA CDRH, Summary of Safety and Effectiveness Data: Apligraf, *Available at*: http://www.accessdata.fda.gov/cdrh_docs/pdf/P950032b.pdf. In 2001, CMS granted Apligraf pass-through status as a biological pursuant to 42 U.S.C. §1395*l*(t)(6). Although Apligraf was originally approved under a PMA, Organogenesis asserts that it has been informed by the Center for Biologics at the FDA that all new clinical indications for Apligraf will be approved through the Biologic License Application ("BLA") pathway. *See* Pl.'s Mot. for Preliminary Injunction, 15, Dec. 20, 2013, ECF No. 3.

On July 19, 2013, by notice of proposed rulemaking in the Federal Register, CMS proposed to begin packaging together a category known as "skin substitutes," which included Apligraf, with their associated surgical procedures. *See* 78 Fed. Reg. 43534, 43571. CMS issued

the final rule on December 10, 2013. 78 Fed. Reg. 74826, 74930 (Dec. 10, 2013). The Final Rule further divides "skin substitute" products into high-cost and low-cost categories, and provides different payment rates for each group. *Id.* Apligraf is assigned to the high-cost category. *Id.* By packaging Apligraf with its corresponding surgical procedure, instead of reimbursing for Apligraf separately using the SCOD methodology, Organogenesis claims that outpatient hospital reimbursement for Apligraf has been reduced by $730 per unit, and ambulatory surgical center reimbursement has been reduced by $1,215 per unit. Pl.'s Mot. for Preliminary Injunction, 10-11.

Plaintiff argues that this Final Rule improperly groups and reimburses for Apligraf as a part of a procedure package, instead of paying for Apligraf separately as a SCOD. Plaintiff believes that Apligraf is properly a SCOD, and thus should be reimbursed separately using the Congressionally prescribed SCOD methodology. Plaintiff seeks a preliminary injunction of the CMS's final rule. Defendant has filed a motion to dismiss Plaintiff's complaint for lack of jurisdiction.

### III. LEGAL STANDARD

#### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction, and the burden establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

377 (1994); *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011) (citing *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 63 (D.D.C. 2006)).

Jurisdiction must be established in each type of case brought before the Court, including challenges to an agency action. Indeed, while the "APA generally establishes a cause of action for those suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," the "APA does not apply, however, to the extent that … statutes preclude judicial review." *Texas Alliance for Home Care Services v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012) (internal quotations omitted); 5 U.S.C. §701(a)(1) (stating that the judicial review provisions of the Administrative Procedure Act are inapplicable to the extent that "statutes preclude judicial review"). However, to determine "[w]hether and to what extent a particular statute precludes judicial review," a Court must look to the statute's "express language…the structure of the statutory schemes, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). The presumption is in favor of permitting review of administrative action, but that presumption can be overcome where "congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" *Id.* at 351 (quoting *Ass'n of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 157 (1970)).

### IV. ANALYSIS

Defendant has moved to dismiss Plaintiff's complaint, arguing that this Court lacks jurisdiction to entertain Plaintiff's claim because: 1) adjustments to OPPS funding decisions are not subject to judicial review, pursuant to 42 U.S.C. §1395*l*(t)(12)(A), and 2) the administrative remedies available under the Medicare Statute were not first pursued. The Court finds that it

lacks jurisdiction to hear Plaintiff's claims pursuant to 42 U.S.C. §1395*l*(t)(12)(A), and thus does not reach Defendant's second argument.

To determine "[w]hether and to what extent a particular statute precludes judicial review," a Court must look to the statute's "express language…the structure of the statutory schemes, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). Nonetheless, the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)).

42 U.S.C. §1395*l*(t)(12)(A) states that "there shall be no…judicial review…of this title or of the development of the classification system…including the establishment of groups and relative payment weights for covered OPD [Out Patient Department] services." The D.C. Circuit has previously interpreted this provision to "clearly preclude judicial review of the Secretary's adjustments to prospective payment amounts." *Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004). Moreover, the D.C. Circuit found that the legislative history comports with a preclusion of judicial review of CMS's authority to set prospective payment methodologies. "That Congress would use such language of prohibition is unsurprising, for piecemeal review of individual payment determinations could frustrate the efficient operation of the complex prospective payment system." *Id.* CMS argues that it has the authority to re-classify and repackage Apligraf with other skin substitute products pursuant to its broad powers to establish groups under 42 U.S.C. §1395*l*(t)(2).

Plaintiff agrees that if Apligraf is properly considered a regular OPD service under §(t)(2), then CMS was appropriately acting pursuant to its broad authority to "establish groups" under §(t)(2), and thus §(t)(12)(A) does in fact preclude this Court's review of the matter. However, Plaintiff argues that Apligraf is not a regular OPD service, and instead should properly be considered a SCOD under 42 U.S.C. §1395*l*(t)(14), for which Congress has required a separate, unpackaged payment mechanism. By grouping Apligraf payments with its surgical procedure, Plaintiff asserts that CMS acted contrary to Congress's mandate, and outside its statutory authority, thus providing an "exception to the general statutory bar" of judicial review in such cases. Pl.'s Reply in support of Preliminary Injunction, 3, Jan. 27, 2014, ECF No. 15; *see also Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004) (construing §(t)(12) to "prevent review only of those 'other adjustments' that the Medicare Act *authorizes* the Secretary to make"); *Texas Alliance for Home Care Servs. v. Sebelius*, 811 F. Supp. 2d 76, 94 (D.D.C. 2011) ("exception" to the jurisdictional bar where the agency acts *ultra vires*).

Indeed, the only question this Court must decide is whether Apligraf properly qualifies as a SCOD pursuant to 42 U.S.C. §1395*l*(t)(14) and 42 U.S.C. §1396r-8(k)(2). That is because if Apligraf qualifies as a SCOD, this Court may hear the case under the *ultra vires* doctrine of review, Def.'s Reply in support of Mot. to Dismiss, 2, Feb. 6, 2014, ECF No. 17, and that if Apligraf does not qualify as a SCOD, 42 U.S.C. §1395*l*(t)(12)(A) precludes this Court's review. Pl.'s Reply at 3. Def.'s Reply in support of Mot. to Dismiss, 2. When "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action…the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the preclusion on judicial review." *Amgen, Inc.*, 357 F.3d at 98.

The Court thus turns to the statutory language of the relevant definitional provisions. 42 U.S.C. §1395*l*(t)(14) defines a SCOD as follows:

> In this paragraph, the term "specified covered outpatient drug" means, subject to clause (ii), a covered outpatient drug (as defined in section 1396r-8(k)(2) of this title) for which a separate ambulatory classification group (APC) has been established and that is--
>
> (III) a radiopharmaceutical; or
>
> (IV) a drug or biological for which payment was made under paragraph (6) (relating to pass-through payments) on or before December 31, 2002.

According to the plain language of this provision, a SCOD must first meet the definition of a "covered outpatient drug." Covered outpatient drug is defined as follows:

> Subject to the exceptions in paragraph (3), the term "covered outpatient drug" means –
>
> (A) of those drugs which are treated as prescribed drugs for purposes of section 1396d(a)(12) of this title, a drug which may be dispensed only upon prescription (except as provided in paragraph (5)), and—
>
> (i) which is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 355 or 357] or which is approved under section 505(j) of such Act [21 U.S.C.A. § 355(j) ];
>
> (ii) (I) which was commercially used or sold in the United States before October 10, 1962, or which is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug; and (II) which has not been the subject of a final determination by the Secretary that it is a "new drug" (within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 321(p)]) or an action brought by the Secretary under section 301, 302(a), or 304(a) of such Act [21 U.S.C.A. § 331, 332(a), or 334(a) ] to enforce section 502(f) or 505(a) of such Act [21 U.S.C.A. § 352(f) or 355(a) ]; or
>
> (iii) (I) which is described in section 107(c)(3) of the Drug Amendments of 1962 and for which the Secretary has determined there is a compelling justification for its medical need, or is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug, and (II) for which the Secretary has not issued a notice of an opportunity for a hearing under section 505(e) of the Federal

> Food, Drug, and Cosmetic Act [21 U.S.C.A. § 355(e) ] on a proposed order of the Secretary to withdraw approval of an application for such drug under such section because the Secretary has determined that the drug is less than effective for some or all conditions of use prescribed, recommended, or suggested in its labeling; and
>
> (B) a biological product, other than a vaccine which—
>
>   (i) may only be dispensed upon prescription,
>
>   (ii) is licensed under section 262 of this title, and
>
>   (iii) is produced at an establishment licensed under such section to produce such product; and
>
> (C) insulin certified under section 506 of the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 356].

Defendant argues that Apligraf does not meet the definition of a covered outpatient drug because "it is not approved under section 505, 507, or 505(j) of the Federal Food, Drug, and Cosmetic Act….[n]or was Apligraf commercially used or sold in the United States before the date of the enactment of the Drug Amendments of 1962….[n]or is Apligraf a biologic product licensed under section [262] of the Public Health Service Act." Def.'s Mot. to Dismiss, 15. "Finally, Apligraf is not an insulin." *Id.*

Plaintiff does not dispute that Apligraf does not meet the definition of a covered outpatient drug on its face. Indeed, Plaintiff acknowledges that 42 U.S.C. §1396r-8(k)(2) makes "explicit reference only to drug and biological approval pathways" but that Apligraf was "approved by the FDA under a device approval pathway." Pl.'s Reply in Support of Preliminary Injunction, 4. However, Plaintiff argues that Apligraf was approved as a device approval pathway "due only to a historical fluke present at the time in the regulations," and that Apligraf is indeed the same kind of biological that would be approved under the biological license pathway today. Pl.'s Reply, 5. In fact, Plaintiff asserts that if it were to seek new FDA approval

11

for Apligraf today, "it would be required to file a biologic license application, which is one of the pathways specifically identified in the SCOD definition." *Id.*

Unfortunately for Plaintiff, even if Apligraf's approval category was due to a historical fluke, Apligraf simply does not meet the plain statutory terms of a covered outpatient drug. Although "a reviewing court should not confine itself to examining the meaning or ambiguity of certain words or phrases" without looking to their context, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007), "[o]ur inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson*, 519 U.S. at 340. And Plaintiff has not identified a single ambiguous term in the statute. Indeed, Plaintiff appears to concede that it does not meet the explicit terms of the statute, and instead asks the Court to read in an exception to the definition. However, when the statute is unambiguous, the "statutory language is generally enforced as written and may be departed from only on 'the most extraordinary showing of contrary intentions in the legislative history.'" *Hennepin Cnty. v. Fed. Nat. Mortgage Ass'n*, 742 F.3d 818, 821 (8th Cir. 2014) (citing *United States v. Sabri*, 326 F.3d 937, 943 (8th Cir.2003)).

Plaintiff does not point to such contrary legislative intent here. At best, Plaintiff argues that, despite the statutory language, Apligraf should be treated as a SCOD under the statute because CMS reimbursed Apligraf as a SCOD since 2004 — "a time when CMS treated as SCODs only those products it viewed to be SCODs under the statute." Pl.'s Reply at 6. Plaintiff thus argues that CMS's previous determination should be given precedential value.[1]

---

[1] Plaintiff also seems to argue that Congress has, by its failure to revise or repeal the agency's interpretation, implicitly approved of CMS's decision to treat Apligraf as a statutory SCOD. However, CMS has never issued a rule or interpretation of the statute in which it explicitly states that Apligraf is a statutory SCOD. Additionally, because CMS has treated non-SCOD drugs as SCODs as a matter of policy for a majority of Apligraf's payment history, Congress may have

However, CMS's treatment of Apligraf as a SCOD holds little, if any, precedential value. Although CMS acknowledges that it did, at one point, "mistakenly" pay for Apligraf as a biological, it has never explicitly labeled Apligraf as a SCOD. Moreover, CMS asserts that Apligraf was only "mistakenly" considered a statutory SCOD for two years — beginning in 2006, CMS began applying the SCOD payment methodology to non-SCODs as a matter of policy. 77 Fed. Reg. 68,210, 68,383 (Nov. 15, 2012). Thus, CMS does not believe that its brief initial mistake can create an implicit exception to the statute's clear language.

More importantly, this Court simply cannot review the merits of CMS's decision here, because CMS is not acting *ultra vires*. As this Circuit has previously held, "[c]ourts will exercise their power to review alleged *ultra vires* agency action when an agency 'patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute.' " *Hunter v. Fed. Energy Reg. Comm'n*, 569 F. Supp. 2d 12, 16 (D.D.C. 2008) (citing to *Griffith v. FLRA*, 842 F. 2d 487, 493) (D.C. Cir. 1988). This Court has already found that Plaintiff is not a SCOD under the plain terms of the statute. Thus, CMS's application of the unambiguous statute as written cannot be considered an *ultra vires* act.

Accordingly, the Court finds that Apligraf does not meet the statutory definition of a SCOD, and is thus governed by the general OPD grouping provisions of 42 U.S.C. §1395*l* (t)(2).

---

been ignorant of the statutory ambiguity surrounding Apligraf's status. As a result, Congress's silence in this instance is hardly sufficient to overcome the clear and unambiguous terms of the statute. *See e.g. Zuber v. Allen*, 396 U.S. 168, 185-86 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis."); *Brown v. Gardner*, 513 U.S. 115, 121-22 (1994) ("As we have recently made clear, congressional silence lacks persuasive significance, particularly where administrative regulations are inconsistent with the controlling statute.")(internal quotation marks omitted). This is especially true where the agency's prior interpretation is in fact inconsistent with the plain language of the statute. *See Brown*, 513 U.S. at 121-22.

Because CMS is not acting *ultra vires,* the Court's jurisdiction to review the merits of the agency's final rule is precluded pursuant to 42 U.S.C. §1395*l*(t)(12)(A).

## V. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted. As such, Plaintiff's motion for a preliminary injunction is denied as moot. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: May 6, 2014　　　　　　　　　　　　　　　　　　　　RUDOLPH CONTRERAS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge